❐ Original       ❐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  26-919M(NJ) |
| A black Dodge pickup truck, bearing Wisconsin license plate JG5391 (Dodge), and George C. MCFARLAND (DOB. XX/XX/1984) as further described in Attachments A. | ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachments A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     May 5, 2026     *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. Nancy Joseph     .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*     ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     4/21/2026; 1:03 p.m.                    _____
                                                                                              *Judge's signature*

City and state:     Milwaukee, Wisconsin                    Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                                              *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A-2

## PERSON TO BE SEARCHED

The person to be searched is George C. MCFARLAND (DOB. XX/XX/1984).

24

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between October 1, 2025, to present including:

a. Evidence of the crime described above;

b. Controlled substances, including fentanyl;

c. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

a. Preparatory steps taken in furtherance of that crime;

b. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

c. Evidence of motive, intent, or knowledge of the crime described above;

d. Evidence of the location, whereabouts, and patterns of travel of George C. MCFARLAND (DOB. XX/XX/1984);

e. Evidence about the appearance, clothing, and identity of George C. MCFARLAND (DOB. XX/XX/1984);

f. All bank records, checks, credit card bills, account information, and other financial records;

g. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

h. Lists of drug customers and related identifying information;

i. Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

k. Indicia of residency;

l. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

m. U.S. Currency;

25

n.  Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

o.  Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of any individuals found in the Dodge to the fingerprint sensor ("Touch ID") and (2) to present the face of any individuals found at the Dodge to the facial recognition sensor, such as a camera, ("Face ID") of the device found at the Dodge for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note:  The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers.  If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.  If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.

26

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>A black Dodge pickup truck, bearing Wisconsin license plate JG5391<br>(Dodge), and George C. MCFARLAND (DOB. XX/XX/1984) as further<br>described in Attachments A. | )<br>)<br>)<br>)<br>)<br>)    Case No. 26-919M(NJ)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846, & 843 | Distribute controlled substances—Fentanyl; Conspiracy to possession with intent to distribute and controlled substances—Fentanyl; and use of a communication facility to further a drug trafficking offense |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DCI SA Mitchell Ward
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 4/21/2026

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
SEARCH WARRANT
COMPLAINT & ARREST
WARRANT**

I, Mitchell Ward, being first duly sworn, hereby depose and make this affidavit in support of:

(A) a complaint seeking arrest warrant naming George C. MCFARLAND (DOB. XX/XX/1984) and Michael D. LIPSEY (DOB XX/XX/1974); and

(B) an application for a search warrant to seek evidence of illegal distribution of controlled substances, and conspiracy to possess with the intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Sections 841 and 846; use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843. The items to be searched pursuant to this warrant is a black Dodge pickup truck, bearing Wisconsin license plate JG5391 (Dodge) (Attachment A-1)and George C. MCFARLAND (DOB. XX/XX/1984) (Attachment A-2) (collectively "Attachments A).

**<u>INTRODUCTION AND BACKGROUND</u>**

1.        I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) and have been a sworn officer in the State of Wisconsin for over 33 years. I am currently assigned to DCI's Milwaukee Field Office, Narcotics Bureau. I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

1

2. As a federal task force officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialize in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

3. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code,

2

Sections 1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

d. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

f. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g. I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and has obtained information from them regarding acquisition, sale,

3

importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, and court-ordered wiretaps, analysis of phones, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers. I have worked with local, state and federal law enforcement agents investigating the possession, use and trafficking of controlled substances and weapons in the Milwaukee area. I have participated in the execution of numerous search warrants in which weapons were seized. I have worked with informants in the investigation of drug trafficking in the Milwaukee area. I have participated in search warrants, investigations, and arrests in which controlled substances and drug paraphernalia were seized. I am familiar with the street names of various drugs in the Milwaukee area including marijuana, ecstasy, heroin, fentanyl, and cocaine; I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the Milwaukee area;

5. I have investigated violations of Federal law, directed drug investigations, obtained and executed search and arrest warrants related to the distribution of illegal narcotics and illegal firearm possession, and debriefed confidential informants and cooperating defendants. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

4

6. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7. This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter.

8. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that at least beginning in October 2025 and continuing till preset, in the Eastern District of Wisconsin, George MCFARLAND, Michael LIPSEY, and others violated 21 U.S.C. § 841(a)(1), 843(b), and 846 (conspiracy to possession with intent to distribute and controlled substances—Fentanyl; and use of a communication facility to further a drug trafficking offense). And that on October 10, 2025, October 12, 2026, and February 18, 2026, in the Eastern District of Wisconsin, George MCFARLAND, and others violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(A) (distribute controlled substances—Fentanyl). And that on March 4, 2026, in the Eastern District of Wisconsin, Michael LIPSEY, violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(A) (possession with intent to distribute controlled substances—Fentanyl). and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime).

9. Further, there is probable cause to search the locations described in Attachments A for evidence of these crimes, as described in Attachment B.

### PROBABLE CAUSE

5

10.     In the fall of 2025, the Onedia County Sheriff initiated an investigation into the defendant, George C. MCFARLAND (DOB. XX/XX/1984) and a drug trafficking organization (DTO) headed by George MCFARLAND. Said investigation subsequently revealed that MCFARLAND is a large-scale distributor of Fentanyl and Cocaine in the Milwaukee area and provided controlled substance to Michael D. LIPSEY (DOB XX/XX/1974), who re-distributes the controlled substance in the Milwaukee area.

**Arrest of Jessie KINDT on October 10, 2025**

11.     On October 10, 2025, case agents stopped a silver Buick Century (WI AXA6529) on County Highway L near the intersection of Quiet Cove Road, Onedia County WI. Case agents arrested the driver and only occupant, Jessie KINDT. KINDT was wanted by the Wisconsin Department of Corrections for violating the conditions of probation regarding a felony conviction.  During a search of KINDT's vehicle, case agents recovered 50.5 grams of fentanyl, 26.3 grams of methamphetamine and other items of drug paraphernalia.

12.     On October 11, 2025, case agents conducted a mirandized interview with KINDT.  KINDT stated that he traveled to Milwaukee on October 10, 2025, and purchased 50 grams of fentanyl from a black male he described as being heavy set with braided hair and driving a pickup truck. KINDT stated that he only knew this supplier by his nickname, "Blue Ace." KINDT stated since his release from prison in July of 2025, he has been periodically traveling to Milwaukee to purchase fentanyl.  KINDT further stated that Kurtis CLINE has also traveled to Milwaukee on his behalf to purchase fentanyl on two separate occasions. On both occasions, CLINE purchased 50 grams of fentanyl and brought it back to KINDT in Oneida county.

**Arrest of Kurtis CLINE and Keeley HILL**

6

13. On December 12, 2025, at approximately 1:21 pm, Investigator Linsmeyer observed court authorized electronic surveillance of CLINE's cell phone 715-499-4034 travelling south on US HWY 51 near the Irma Wisconsin area. Investigator Linsmeyer continued to monitor the court authorized electronic surveillance of CLINE's cell phone, to which Investigator Linsmeyer was able to track CLINE's cell phone continuing traveling south towards the Milwaukee area. Based on the prior investigation, CLINE's cell phone being in contact with MCFARLAND's number 414-850-1859, and CLINE appearing to be travelling to the Milwaukee area, Investigator Linsmeyer believed CLINE was traveling to Milwaukee area to obtained controlled substance and anticipated CLINE would arrive around 4:30 pm. Investigator Linsmeyer utilized other investigative resources and identified CLINE to be operating a silver 2010 Jeep Wrangler, bearing Wisconsin license plate AYY-6355 (Jeep). Investigator Linsmeyer observed that the Jeep appeared to be traveling in the same area of CLINE's cell phone.

14. Investigator Linsmeyer obtained a signed state search warrant for the Jeep by a judge at the Onedia County Courthouse.

15. Investigator Linsmeyer was able to determine that the Jeep was in the area of the Potawatomi Casino in the city of Milwaukee. Case agents observed the Jeep parked and unoccupied inside the parking garage of the casino. Case agents also observed a black Dodge pickup truck, bearing Wisconsin license plate JG5391 (Dodge) parked in the structure. Case agents reviewed Wisconsin Department of Transportation records and identified MCFARLAND as the registered owner of the Dodge. Case agents observed the Jeep leave Potawatomi Casino and travel from the Milwaukee area. The Jeep ultimately stopped at a *La Quinta* hotel in Oshkosh, Wisconsin. The Jeep remained at *La Quinta* hotel overnight from December 12 until December

7

13, 2025. Investigator Linsmeyer then identified the Jeep to be leave the Oshkosh area at approximately 11:40 a.m., on December 13, 2025.

16. On December 13, 2025, Investigator Linsmeyer along with other case agents attempted to stop the Jeep in Onedia, Wisconsin. As Investigator Linsmeyer activated siren and emergency lights on the police vehicle, the Jeep continued to travel at approximately 70 mph for approximately one hundred fifty yards. Investigator Linsmeyer observed the Jeep to attempt to quickly turn into a driveway off Boyce Drive. As the Jeep was turning into the driveway, Investigator Linsmeyer observed the Jeep miss the driveway and almost traveled into the ditch. As Investigator Linsmeyer approached the Jeep at a high rate of speed, Investigator Linsmeyer observed the Jeep's reverse lights turn on. Investigator Linsmeyer believed the Jeep was attempting to elude investigators, so Investigator Linsmeyer drove directly behind the Jeep eventually stopping the Jeep's movement and not allowing the Jeep to continue to elude or flee.

17. The Jeep was driven by CLINE. Additionally, Keeley Marie HILL (DOB:XX-XX-1997) was the only passenger at the time of the stop. Case agents conducted a search of Jeep pursuant to a state search warrant and recovered: 0.9 grams of suspected crack cocaine; approximately 2 grams of suspected marijuana; a digital scale with suspected cocaine residue; a syringe containing an unidentified clear liquid; and other items of drug paraphernalia.

18. Case agents interviewed Keeley HILL regarding this investigation. HILL stated that she and CLINE traveled to Potawatomi Casino on December 12, 2025. When they reached the casino, they met with a black male in the parking garage. HILL and CLINE got into a Dodge Ram pickup truck that the unknown black male was operating. At this time CLINE purchased $1,500 worth of fentanyl from the black male. HILL stated that the unknown own male also gave give a small amount of crack cocaine. Afterwards, HILL and CLINE spent some time in the casino

8

before leaving the Milwaukee area. HILL provided a physical description of the subject CLINE purchased the fentanyl from, which case agents observed was consistent with the physical description of MCFARLAND.

19. HILL further stated that she and CLINE spent the night of December 12, 2025, in Oshkosh before returning to Onedia County. When HILL and CLINE were in Onedia County, Hill stated that CLINE told her they were "getting pulled over." HILL stated that as CLINE was attempting to pull into a driveway, CLINE was hanging out of the driver's side window and was throwing the fentanyl into the woods area of the driveway.

20. On December 14, 2025, Investigator Linsmeyer, Horwath, Brown and K9 Odin began looking for the fentanyl in the described location. Investigator Linsmeyer ultimately located a purplish in color substance located in a plastic bag with the corner cut. Investigator Linsmeyer believed the substance was likely fentanyl. Based on the amount HILL discussed CLINE paying to MCFARLAND for the controlled substances, investigators believe there may have been additional amounts of fentanyl also in the area. Investigator Linsmeyer and Horwath were unable to locate the remaining fentanyl that was described to be in the ditch area at that time. The purple substance field-tested positive for the presence of fentanyl with an approximate weight of 3.3 grams.

21. On December 14, 2026, CLINE provided a *Mirandized* statement. CLINE acknowledged that he contacted "George" at 414-850-1859 (MCFARLAND) to purchase fentanyl in Milwaukee, Wisconsin. CLINE provided consent for case agents to search his cellphones. Case agents observed a contact in CLINE'S phone of "George" and telephone number 414-850-1859 (MCFARLAND). CLINE stated that the transaction took place in a black Dodge pickup truck, parked in the parking garage of the Potawatomi Casino in Milwaukee. CLINE stated that he

9

contacted "George" by phone prior to coming to the Milwaukee area. "George" told CLINE to meet him at the casino. CLINE stated that he received a text message from "George" alerting CLINE that he was at the casino. CLINE stated that he was introduced to "George" by Jessie KINDT and has picked up fentanyl in Milwaukee from "George" on behalf of KINDT as well as himself. CLINE has purchased fentanyl from "George" over six times in Milwaukee during the past six months. CLINE stated that he has picked up as much as 28 grams of fentanyl from "George."

**Controlled Buy with MCFARLAND**

22. On February 18, 2026, case agents conducted a controlled purchase of fentanyl and cocaine base from MCFARLAND. Case agents met with CS-1 prior to the controlled buy. CS-1 was searched and no contraband was round. Under the direction of case agents, CS-1 made a consensually recorded call to MCFARLAND's telephone 414-850-1859. MCFARLAND told CS-1 to meet him at the Walgreens near South 6th Street and West Oklahoma Ave, Milwaukee, Wisconsin. Case agents provided CS-1 with a recording device and investigative funds. Case agents then drove CS-1 to the parking lot of the Walgreens located at 620 West Oklahoma Avenue.

23. Prior to CS-1's arrival, case agents conducting surveillance observed MCFARLAND parked in the lot sitting in the driver's seat of his Dodge. At approximately 2:17pm, case agents parked to the north of the Dodge and recognized MCFARLAND as the driver. CS-1 then exited the auto and got into the Dodge. A few moments later, CS-1 returned to case agents' auto and turned over two plastic bags with suspected controlled substances. One contained suspected cocaine base and the other suspected fentanyl. Case agents then left the area and surveillance was ended. CS-1 stated that while inside of MCFARLAND's Dodge, CS-1 purchased both suspected fentanyl and cocaine base from MCFARLAND.

10

24. Case agents field tested the suspected fentanyl and received a positive indication for the presence of fentanyl with a weight of 1 gram. Case agents also tested the suspected cocaine base and received a positive indication for the presence of cocaine with a weight of 8 grams. Additionally, case agents reviewed the recording of the controlled buy from MCFARLAND and found it to corroborate CS-1's account of what took place.

25. CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities. CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-1 has made statements against his/her penal interests. CS-1 has no felony convictions. CS-1 has one open felony matter in the states of Wisconsin for possession of narcotics. CS-1 has no arrests or convictions relating to dishonesty. CS-1 is cooperating with law enforcement for judicial consideration.

**Arrest of LIPSEY and Search Warrant at 2319 West Michigan St, Apt 101**

26. On March 4, 2026, case agents coordinated an arrest operation for Michael LIPSEY DOB XX/XX/XX74. At approximately 12:24 pm, LIPSEY was arrested for a warrant with Racine County outside 2319 West Michigan Street, Milwaukee, Wisconsin. LIPSEY identified his apartment as #105 and denied having control of apartment # 101. LIPSEY provided investigators with verbal consent to search apartment #105 and provided keys to #105 and (later determined) keys to apartments 206 and 101.[1] On LIPSEY's persons, case agents located set of keys (LIPSEY's right hand), wallet with content (LIPSEY's right rear pants pocket), and single Key that opened apartment #101 (tucked inside LIPSEY's black wallet); and cellphones.

---

[1] Based on the investigation and surveillance of LIPSEY, case agents had no information connecting LIPSEY to apartment 206, so the decision was made to not search that location.

11

27.    Upon entering apartment #105, it did not appear LIPSEY resided in apartment # 105. LIPSEY denied controlled or apartment # 101 and refused to provide consent. Investigators utilized LIPSEY's keys (from his person) and opened apartment # 101, to conduct a sweep of the apartment in fear it was occupied and to prevent the destruction of evidence. During this sweep for persons at 2319 West Michigan Street, Apartment # 101 Milwaukee, Wisconsin, case agents observed items consistent with drug trafficking in plain view:

- box of baking soda (cooking agent for cocaine base);
- latex gloves;
- box of sandwich baggies, Social Security card for LIPSEY;
- commercial pesticide card for LIPSEY on the bed;
- small caliber handgun on a nightstand in the bedroom;
- extended magazine on the floor adjacent to the bed;
- digital scale;
- plastic baggie with suspected marijuana; and
- Tupperware (clear) containing baggie with suspected crack cocaine.
- a silver and black Taurus semi-automatic handgun, bearing serial number AEG507832,
- a G3C, 40 caliber Smith and Wesson, loaded with magazine with ammunition, located on nightstand, west of bed, in bedroom;
- a black 40 caliber extended magazine, loaded with ammunition, located on floor next to Aero bed in bedroom;
- 28.04 grams of suspected crack cocaine, inside knotted plastic sandwich baggie, located in clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.50 grams of suspected crack cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 7.09grams of suspected cocaine, in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 3.39 grams of suspected methamphetamine (crystalline), in knotted plastic sandwich baggie, located inside clear tupperware with blue lid on floor next to bed in bedroom;
- 9.06 grams of suspected crack cocaine, in clear square container with white lid on table near south wall in bedroom;
- 8.72grams of suspected crack cocaine, in clear round container with white lid, located on table near south wall in bedroom;
- 16.42 grams of suspected marijuana, in knotted plastic sandwich baggie, located on glass table near south wall in bedroom;

12

- A black/orange WeighMax digital scale located on glass table near south wall in bedroom'
- a razor blade and small spoon located inside clear tupperware with blue lid, which contained cocaine and methamphetamine, on floor next to bed in bedroom; and
- Multiple photographs of LIPSEY located on top of TV stand, closed and stacked, along north wall in living room.

28.     LIPSEY was in possession of a cell phone with the number 414-366-7514.  During a review of LIPSEY's phone extraction pursuant to a search warrant, case agents discovered numerous text messages between LIPSEY and MCFARLAND.  Based on my training, experience, and the investigation into MCFARLAND and others, these text messages are consistent with drug trafficking, they often discuss pricing and locations to meet.

### Recent Surveillance of MCFARLAND

29.     On Saturday, April 18, 2026, case agents were spot checking hotels and motels located around Mitchell International Airport, based on court authorized electronic surveillance obtained from MCFARLAND's telephone.  At approximately 1:00pm case agents observed MCFARLAND's Dodge parked at the Roadway Inn & Suites located at 4400 South 27th Street, Milwaukee, WI.  SA Ward could see that the Dodge was occupied and running. The driver's side window was rolled down enough that case agents recognized the person in the driver's seat as MCFARLAND.  Case agents reviewed electronic surveillance for MCFARLAND's telephone during the surveillance.  Case agents observe that MCFARLAND's telephone location indicated it was also in the area of the Dodge and MCFARLAND, 100 m of the hotel. MCFARLAND remained parked in the Dodge in the lot for about 15 minutes before traveling northbound on South 27th Street. Surveillance was ended shortly thereafter.

### Computers, Electronic Storage and Forensic Analysis

13

30.     As described above and in the Attachment Bs, this application seeks permission to search for records that might be found on the Dodge, and on MCFARLAND, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31.     *Probable cause.*  I submit that if a computer, cellular telephone, or storage medium is found in the Dodge, and on MCFARLAND, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

14

32. *Forensic evidence.* As further described in Attachment Bs, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Dodge, and on MCFARLAND because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic

15

storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

16

f.    I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

33.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.

17

The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

34.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

35.   The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some

18

devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example,

19

Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

36. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

37. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

38. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

39. Due to the foregoing, with respect to any person who is located in the Dodge during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

40. Because other people can easily enter/exit vehicles, as demonstrate during the investigation into MCFARLAND and others, it is possible that the Dodge will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **CONCLUSION**

41. Based on the information above, I submit that there is probable cause to believe that at least beginning in October 2025 and continuing till preset, in the Eastern District of Wisconsin, George MCFARLAND, Michael LIPSEY, and others violated 21 U.S.C. § 841(a)(1), 843(b), and 846 (conspiracy to possession with intent to distribute and controlled substances—Fentanyl; and use of a communication facility to further a drug trafficking offense). I also submit that on October 10, 2025, October 12, 2026, and February 18, 2026, in the Eastern District of Wisconsin, George MCFARLAND, and others violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(A)

21

(distribute controlled substances—Fentanyl). Further, I submit that on March 4, 2026, in the Eastern District of Wisconsin, Michael LIPSEY, violated 21 U.S.C. § 841(a)(1) and 841(b)(1)(A) (possession with intent to distribute controlled substances—Fentanyl). and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime). I further believe that there is probable to believe that located at and in the Dodge and/or on George MCFARLAND, further described in Attachments A, there is evidence of these crimes, all of which is detailed more specifically in Attachment B, that a warrant issue authorizing the search of the same.

22

## ATTACHMENT A-1

### PROPERTY TO BE SEARCHED

A black Dodge pickup truck, bearing Wisconsin license plate JG5391, operated by George C.

MCFARLAND (DOB. XX/XX/1984).

23

## ATTACHMENT A-2

### PERSON TO BE SEARCHED

The person to be searched is George C. MCFARLAND (DOB. XX/XX/1984).

24

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All records, information, and items relating to violations of 21 U.S.C. §§ 841(a)(1), 843 and 846, between October 1, 2025, to present including:

a. Evidence of the crime described above;

b. Controlled substances, including fentanyl;

c. Paraphernalia and tools associated with drug trafficking, to include plastic bags, scales, duffel bags, and money counters;

a. Preparatory steps taken in furtherance of that crime;

b. Evidence of the existence, scope, or overt acts in furtherance of a conspiracy;

c. Evidence of motive, intent, or knowledge of the crime described above;

d. Evidence of the location, whereabouts, and patterns of travel of George C. MCFARLAND (DOB. XX/XX/1984);

e. Evidence about the appearance, clothing, and identity of George C. MCFARLAND (DOB. XX/XX/1984);

f. All bank records, checks, credit card bills, account information, and other financial records;

g. Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

h. Lists of drug customers and related identifying information;

i. Types, amounts, and prices of drugs trafficked, as well as dated, places, and amounts of specific transactions;

j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

k. Indicia of residency;

l. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

m. U.S. Currency;

n.  Evidence indicating how and when electronic devices were accessed or used, to determine the chronological and geographic context of access, use, and events relating to the crime under investigation; and

o.  Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/ or data.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

During the execution of the search of the locations or person described in Attachments A, law enforcement personnel are authorized (1) to press the fingers (including thumbs) of any individuals found in the Dodge to the fingerprint sensor ("Touch ID") and (2) to present the face of any individuals found at the Dodge to the facial recognition sensor, such as a camera, ("Face ID") of the device found at the Dodge for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

Note:  The government will attempt to retrieve and copy all data from computers found at the location to be searched without physically removing said computers.  If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.  If the agent determines that the volume of material found on the premises is voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.